

**FILED**

Feb 21 2019, 8:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Roberta L. Renbarger
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: K.A.H., a Child in Need of Services, <br><br> and <br><br> A.V.U. (Mother), <br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br> *Appellee-Petitioner.* | February 21, 2019 <br><br> Court of Appeals Case No. 18A-JC-1763 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Richard Karcher, Temporary Judge <br><br> The Honorable Sherry Hartzler, Magistrate <br><br> Trial Court Cause No. 02D08-1711-JC-731 |

**Tavitas, Judge.**

## Case Summary

A.V.U. ("Mother") appeals from the trial court's finding that her minor child, K.H., is a child in need of services ("CHINS"). We affirm.

## Issue

Mother raises one issue, which we restate as whether the evidence establishes, by a preponderance of the evidence, that K.H. is a CHINS.

## Facts

Mother, her boyfriend, M.V. ("Boyfriend"), and Mother's children, M.G. and K.H. lived together in Fort Wayne, Indiana. Mother and Boyfriend had a verbally and physically abusive relationship. M.G. and K.H. often overheard and witnessed Boyfriend's screaming, belittling, and battering of Mother. Still, Mother often left M.G. and K.H. in Boyfriend's care because Mother believed that Boyfriend was only violent with her.

In October 2017, the Allen County Department of Child Services ("DCS") opened an investigation regarding alleged abuse or neglect of then-two-year-old M.G., who had a black eye and exhibited petechiae.[1] Mother told investigators that M.G. had received stitches after falling in the bathtub, and that, after the stitches were removed, the resulting bruising and scarring resembled a black

---

[1] "When a person is strangled by compressing the jugular veins, blood vessels in the head become over-inflated with blood, and the smaller vessels will burst, leaving petechiae. When petechiae are caused by strangulation, they are found only in the head. When they are caused by something else, they can be found throughout the body." *Smith v. State*, 891 N.E.2d 163, 165 (Ind. Ct. App. 2008) (citations omitted).

eye. DCS determined that the claim was unsubstantiated and closed the investigation.

[5] On November 28, 2017, Boyfriend babysat M.G. Later that day, M.G. complained to Mother that his head hurt. The following day, Boyfriend again babysat M.G., while K.H. was at school. When K.H. returned from school, Boyfriend would not allow K.H. inside the house despite the cold; Boyfriend insisted that K.H. should play in the backyard. Boyfriend subsequently telephoned Mother to say that M.G. was nonresponsive. M.G. was transported to the hospital, where he was declared deceased.

[6] After M.G.'s death, DCS observed "significant and apparent bruising" on M.G.'s "face, forehead, back, hips and buttocks in multiple stages of healing." App. Vol. II p. 18. An autopsy revealed that M.G. had sustained "multiple blows and strikes from a closed fist," "severe[ ] injur[ies]," and "blunt force trauma to his appendix" before his death.[2] *Id*. at 15, 20. DCS removed K.H. from Mother's care that day.

[7] On December 4, 2017, DCS filed a petition alleging that K.H. was a CHINS.[3] After a hearing, the trial court ordered that K.H. be placed with her maternal grandparents and granted supervised visits to Mother and A.H. ("Father").

_____

[2] On December 6, 2017, the State charged Boyfriend with murder, domestic battery to a minor resulting in death, and aggravated battery.

[3] DCS filed an amended petition on December 17, 2018.

[8] On January 16, 2018, DCS filed a petition to introduce a videotaped forensic interview ("Statement") of K.H. On or about January 30, 2018, the State charged Mother with neglect of a dependent. On March 14, 19, and 23, 2018, the trial court conducted a fact-finding hearing and a hearing to determine whether child hearsay was admissible. On March 23, 2018, the trial court granted DCS' petition to introduce the Statement.[4]

[9] On July 10, 2018, the trial court entered the following findings of fact and conclusions of law:

* * * * *

> 16. The Court finds that the following is undisputed and uncontroverted:
>
> * * * * *
>
> > i. During the course of Mother's relationship with [Boyfriend], the couple would often fight in the family home for which the fights would range from arguments about bills to cheating accusations.

---

[4] The trial court found that: (1) sufficient indicia of reliability justified admission of the Statement; (2) a psychologist certified that participation in the CHINS proceedings "would create a substantial likelihood of emotional or mental harm" to K.H.; and (3) "due to the child's adjustment disorder, depression, anxiety and age, [testifying] would cause [K.H.] to shut down, harm her emotional and mental wellbeing, and worsen her adjustment disorder, depression and anxiety." App. Vol. II p. 17. The trial court, thus, declared K.H. an unavailable witness, pursuant to Indiana Code Section 31-34-13-3, and found that K.H.'s Statement was admissible in the proceeding to determine K.H.'s CHINS status.

j. . . .[A]t times [Boyfriend] would physically abuse Mother in the home with the children present in the home by pushing, shoving her to the ground, and hitting her causing her bruising to her back on one occasion. Mother does not dispute that the children would either be on the trampoline or in their rooms within earshot of the fighting.

k. During the course of arguments, [Boyfriend] would hit [Mother] if she could not dodge his punch. [Boyfriend] would frequently confine Mother to the bedroom and prevent her from leaving. [Boyfriend] would strike Mother either with an open hand or closed fist and he would hit her on her head, back and legs.

* * * * *

17. The Court finds that what is disputed is whether the coercive intervention of the Court is required for which the Court finds as follows:

a. Mother has long been the victim of domestic violence by multiple partners.

b. Mother's previous husband, [L.], the father of [Boyfriend[5]], was convicted of domestic battery precipitating the end of their marriage.

c. Prior to these current proceedings, Mother had never received any counseling concerning domestic violence.

---

[5] We assume that this is a scrivener's error, and that L. is the father of M.G., and not Boyfriend.

d. During the course of Mother's intake interview with SCAN (Stop Child Abuse and Neglect) concerning her visitation on December 13, 2017, Mother stated that [Boyfriend] only ever pushed her.

e. Through the testimony of Mother, she claimed that she was only ever concerned with domestic violence if her children actually witnessed the abuse; that [Boyfriend] didn't "get physical" often and "would stop and immediately start to apologize."

f. Through the testimony of Mother, the court finds that Mother contended that [Boyfriend] wouldn't scream at the kids like he screamed at her; that she would intervene during his discipline of the children if he was mad about them spilling things; that she did frown upon his responses and discipline; and that she thought they "agreed they wouldn't touch each other's kids."

g. However, despite Mother's victimization, she left the children with [Boyfriend] on nearly a daily basis.

h. After the inception of these proceedings, Mother has been receiving therapy and has started to address domestic violence for the first time. According to Mother[,] "now that I know what I know, it concerns me." However, also according to Mother "I wasn't concerned if I was being abused because he couldn't do that to a child."

i. At the time of the fact-finding proceedings, and having seen the autopsy, [Mother] now accepts [Boyfriend] is a "dangerous guy." However, leading up to [M.G.'s] death, [Boyfriend] would provide [Mother with] an explanation that made sense to her. "My son never had marks that were hidden—the marks made sense—I never suspected

anything was going on." Mother now accepts that the child was severely injured and additionally sustained blunt force trauma to his appendix.

18. Mother has not been able to and is currently unable to obtain sufficient help on her own without the State's aid. Prior to the inception of these proceedings, Mother had no recognition that she and her children were in danger. It wasn't until the death of her two-year-old child, the provision of some therapy, and viewing the autopsy report did [sic] Mother accept that [Boyfriend] committed this heinous act against two-year-old [M.G.]. At the time of these proceedings, Mother had not completed her counseling and has not full [sic] comprehended the danger of domestic violence.

19. However, [Mother's] acceptance of the brutality of [Boyfriend] does not conclude the need for the coercive intervention of this Court. Despite having been the victim of domestic violence in the past, Mother did not comprehend that she was being abused again. Moreover, Mother did not comprehend the danger that domestic violence posed to her children. Now, Mother is facing criminal charges for which a no contact [order] has been issued against her in favor of her surviving child.

20. Mother's own supports [sic] did not recognize that two-year-old [M.G.] was being abused even despite having witnessed bruises on the child prior to his death. The Court is struck with the fact that it took the death of [M.G.] for anyone to intervene. Sadly, although it is too late for [M.G.], it is not too late to protect [K.H.].

21. The Court concludes that [K.H.] was [a] witness to the domestic violence to her Mother and was present in the home on

the day that [M.G.] died.  Yet, Mother persists in her contention that the coercive intervention of the Court is not required.

22. The evidence and the reasonable inferences from the evidence and testimony support this Court's determination that Mother had not fully addressed the issue of domestic violence and that she will not remedy the issue without the coercive intervention of the court.  Moreover, [K.H.] had witnessed domestic violence and could verbalize what she saw.  Furthermore, because of the continuing prospect of domestic violence absent this Court's coercive intervention, [K.H.'s] physical and mental health remain in serious danger.  Thus, the evidence is sufficient to support the CHINS adjudication.

23. "A child's exposure to domestic violence can support a CHINS finding." *K.B. v. Indiana Dep't of Child Servs.*, 24 N.E.3d 997, 1003 (Ind. Ct. App. 2015).  Additionally, a single incident of domestic violence in a child's presence may support a CHINS finding, and it need not necessarily be repetitive.  *See id.* at 1003-04.  In *K.B.*, there was evidence that the parties' children witnessed domestic violence and were old enough to comprehend it.

24. Acting under its *parens patriae* power, the State may interfere with parental autonomy when it is "necessary to protect the health and safety of children." *In re V.H.*, 967 N.E.2d 1066, 1072 (Ind. Ct. App. 2012).  The purpose of the CHINS statute is "to help families in crisis—to protect children, not punish parents." *In re S.D.*, 2 N.E.3d 1283, 1285 (Ind. 2014).

25. This trial court must intervene to appropriately protect [K.H.].  The CHINS adjudication is simply a determination that [ ] children are in need of services and are unlikely to receive those services without the court's intervention; it is not a determination of parental fault. *In re N.E.*, 919 N.E.2d 102, 105

[Ind. 2010)]. Clearly Mother requires services to learn how to protect herself so that she can ensure that her child is protected and in a home free from domestic violence.

26. The Court concludes the following initially denied allegations concerning the Petition filed on December 17, 2017 and the Second Amended Petition filed on February 18, 2018, are sustained by a preponderance of the evidence: 5, 6, 7, 8, 9, 10, 11,14, 15, 16, 17, 18, 17.

**JUDGMENT**

27. The Court finds and concludes that [K.H.] is "seriously impaired or seriously endangered as a result of the inability, refusal, and neglect of Mother to supply the children with appropriate shelter and supervision." I.C. 31-34-1-1(1).

28. The Court finds and concludes that [K.H.] requires care, treatment, and rehabilitation that she is not receiving and [that] are unlikely to be provided or accepted without the coercive intervention of the Court. I.C. 31-34-1-1 (2).

App. Vol. II pp. 18-22. Mother now appeals.[6]

# Analysis

[10] Mother appeals from the trial court's CHINS determination. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *N.L. v.*

---

[6] Father has admitted that K.H. is a CHINS. App. Vol. II pp. 15-16.

*Ind. Dep't of Child Servs* (*In re N.E.*), 919 N.E.2d 102, 106 (Ind. 2010). On review, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* We consider only the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the juvenile court was clearly erroneous. *Id.*

[11] Indiana Code Section 31-34-1-1 provides that:

> . . . [A] child is a child in need of services if, before the child becomes eighteen years of age:
>
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>>
>> (2) the child needs care, treatment, or rehabilitation that:
>>
>>> (A) the child is not receiving; and
>>>
>>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[12] "[T]he purpose of a CHINS adjudication is to protect children, not [to] punish parents." *In re N.E.*, 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but rather is a determination that a child is in need of services and is unlikely to receive those services without intervention of the court. *Id.* at 105.

A CHINS adjudication focuses on the condition of the child . . . . [T]he acts or omissions of one parent can cause a condition that creates the need for court intervention. A CHINS adjudication can also come about through no wrongdoing on the part of either parent, e.g., where a child substantially endangers the child's own health or the health of another individual, I.C. § 31-34-1-6; or when a child is adjudicated a CHINS because the parents lack the financial ability to meet the child's extraordinary medical needs.

*Id.* (citations omitted).

We initially note that "a child's exposure to domestic violence can support a CHINS finding."[7] *K.B. v. Indiana Dep't of Child Servs.*, 24 N.E.3d 997, 1003 (Ind. Ct. App. 2015). Additionally, a single incident of domestic violence in a child's presence may support a CHINS finding, and it need not necessarily be repetitive. *See id.* at 1003-04.

Mother challenges the trial court's finding that "K.H. is seriously impaired or seriously endangered as a result of the inability, refusal, and neglect of Mother to supply the children with appropriate shelter and supervision." App. Vol. II p. 21. Specifically, Mother disputes the trial court's findings that: (1) Mother failed to prevent K.H. from viewing domestic violence in the home; (2) K.H. observed Boyfriend battering Mother; and (3) K.H. was present in the home

---

[7] In *K.B.,* we affirmed the trial court's adjudication of the parties' children as CHINS where the children witnessed domestic violence and were old enough to comprehend it.

when Boyfriend allegedly killed M.G. *See* Appellant's App. pp. 19-21; *see* Appellant's Br. pp. 12-13. Mother also maintains that Boyfriend's arrest "resolved" any "immediate issue of exposure to domestic violence, occurring in the home[.]" *Id*. at 15.

[15] Additionally, Mother counters that K.H. has no need of the trial court's coercive intervention because Mother and K.H. are "involved in ongoing counseling"; K.H. receives grief counseling; and, after M.G.'s death, K.H. was placed with maternal grandparents, who comprise "a major portion of [Mother's] support group[.]"[8] Appellant's Br. p. 13, 15, 16.

[16] We paraphrase and restate the following key findings of the trial court, which go to the heart of its determination that K.H. is a CHINS: (1) before the underlying proceedings, Mother did not recognize the extent to which she and her children were in danger; (2) despite having previously been victimized by domestic violence, Mother did not recognize that she was being abused again when Boyfriend battered her; and (3) given the continuing prospect of domestic violence, Mother requires services to empower her so that she can protect herself and ensure the safety of her child(ren).

[17] At the fact-finding hearing, DCS presented the following evidence in support of its petition alleging that K.H. is a CHINS. First, DCS presented the Statement,

---

[8] Mother also maintains that she has never been homeless; that her places of residence have "all had working utilities[ ] and food"; and that she has "always sought and received appropriate medical care for the children[.]" Appellant's Br. p. 13.

Patricia Smallwood's[9] forensic interview of K.H., wherein K.H. stated, in part, the following:

> Pat Smallwood: So how do [Boyfriend] and your mom get along?
>
> [K.H.]: That's a hard one, I don't know.
>
> Pat: Do they fight?
>
> *[K.H.] Nods*
>
> Pat: Do they fight with their words or with their bodies or how do they fight?
>
> [K.H.]: [W]ith their words[.]
>
> Pat: So what happens when [Boyfriend] gets really angry?
>
> [K.H.]: He touches mommy in a bad way[.]
>
> Pat: What do you mean?
>
> [K.H.]: He hits her[.]
>
> Pat: He hits your mom?

---

[9] Patricia Smallwood is a forensic interviewer at the Child Advocacy Center at the Dr. Bill Lewis Center for Children.

*[K.H.] nods yes*

Pat Smallwood: When he hits your mom where does he hit her?

*[K.H.] points to legs, arms, and shoulders*

Pat: On her legs?  Arms?  Oh, everywhere?

*[K.H.] nods yes*

Pat: [A]nd what does your mom do?

[K.H.]: I don't know[.]

Pat: Does anybody cry?

[K.H.]: [Y]es mommy does.

App. Vol. II pp. 16-17 (emphasis added).

[18]     Next, DCS presented testimony from Melissa Nelson, intake and training supervisor for the restoration department of SCAN.[10]  Nelson testified that she oversaw Mother's SCAN intake and Mother reported that Boyfriend had "only ever pushed her," which is untrue.  Tr. Vol. II p. 52.  DCS also presented testimony from family case manager, Kalie Ellert, who testified that, "due to the [ ] death of [M.G.,] there were also concerns for [K.H.] in the home [ ] due

---

[10] The SCAN organization aims to "Stop Child Abuse And Neglect."  App. Vol. II p. 19.

to the domestic abuse or physical abuse[,]" and given "the lasting effects of witnessing domestic violence [ ] and seeing what it can do long-term." *Id*. at 56, 57.

[19] The trial court also heard Mother's troubling testimony regarding her experience with domestic abuse. Mother testified that she and Boyfriend argued about "[n]ormal couple" matters. *Id*. at 60. The following exchanges ensued under direct and cross examination of Mother:

> Q    [With Boyfriend] [w]as it [ ] verbal arguments or did it get physical?
>
> A    Depended on the day.
>
> Q    Okay so how often did it get physical?
>
> A    Not very often.
>
> Q    Okay and what would happen when it did get physical?
>
> A    (sigh) I mean there was a few times where he had put his hands on me um but it wasn't anything where I'd have to go to the emergency room or anything like that (sniffle).
>
> Q    Okay when you say it he put his hands on you can you tell me kind of what you mean . . . ?
>
> A    Um shoving pushing um he's hit me a few times (sniffle).

Q      And where were the children during these um arguments you guys would have?

A      Um they were in their rooms or they would be outside in the backyard playing on the trampoline.

Q      Would you say that they were within earshot at all?

A      Um if they were in their room yes.

Q      Were they able to see you guys at any point through a hallway or anything?

A      No.

Q      Did you have [ ] any concerns about what the children might have been exposed to when that happened?

A      Um not necessarily because they didn't see anything going on.

* * * * *

Q      Ah when you were getting into those arguments you said they got physical was there um when they got verbal was it loud at all?

A      Um sometimes.

Q      Okay and how did that make you feel?

* * * * *

A        I felt like I was nothing because whatever he said he would find any little insecurity I had and that's what he would attack me with.

*****

Q        Okay and when he did actually make contact with you was it with his hand or his foot or how did he connect with you?

A        It was usually his hand.

Q        Okay was it a closed hand or an open hand?

*****

A        —I think like closed fist like maybe once other than that it was usually opened.

*Id.* at 60-61, 63, 68.

[20]    Mother also testified that K.H. and M.G. were within earshot of Mother's and Boyfriend's arguments "[m]aybe a handful of times[,]" "[p]ossibly" ten or more times; and that Boyfriend "yell[ed]" at the children "if they did something bad," but "not necessarily . . . screaming like he [did] with [her] when [Mother and Boyfriend] were fighting." *Id.* at 65, 66, 69-70.  She also testified that her relationship with Boyfriend was not her first violent relationship and that "[her] ex-husband was that way." *Id.* at 71.  Mother testified that, until M.G.'s death, she was "not concerned" about leaving Boyfriend alone with the children. *Id.* at 91.  When she was asked "was it concerning that you [were] having the

altercations you were having and [Boyfriend] was alone with the children every day[,]" Mother replied, "No because somebody can abuse their spouse and not touch a child." *Id.*

[21] Here, the trial court heard evidence that: (1) K.H. was aware that Boyfriend "hits" Mother and that "[M]ommy [cries,]" *see* App. Vol. II p. 17; (2) K.H. witnessed Boyfriend's physical abuse of Mother and could indicate on her own body where Boyfriend had struck Mother; (3) K.H. was aware of and felt the impact of Boyfriend's alleged killing of M.G.; (4) Mother has been victimized by domestic violence in at least two relationships; (5) despite Boyfriend's violence toward her, Mother continued to leave the children in his care and extended Boyfriend the benefit of the doubt regarding M.G.'s injuries; (6) despite warning signs, Mother did not appreciate the extent to which she and the children were in danger until M.G.'s death; (7) the unique circumstances of the case prompted DCS' concern regarding "the lasting effects of witnessing domestic violence" on K.H., *id.* at 57; and (8) Mother did not undergo therapy relating to domestic violence until after M.G.'s death.

[22] We are sensitive to the fact that a CHINS finding is not a determination of parental fault; we also appreciate the fact that Mother has been battered in two relationships and has suffered the devastating loss of a child. That said, Mother's contention that Boyfriend's arrest, following M.G.'s death, eliminated the need for coercive intervention of the trial court is stunning in its lack of self-awareness. We find most disturbing the fact that the postmortem examination

of M.G. revealed bruises all over his body in various stages of healing; yet, Mother maintains that she was unaware of the abuse.

[23] The domestic violence that allegedly resulted in M.G.'s death is not an isolated incident in Mother's life. At issue before the trial court was not just reckoning with the aftermath of M.G.'s senseless death, but also with Mother's inability to protect her children from ongoing domestic violence. We agree with the trial court that, "although it is too late for [M.G.], it is not too late to protect" K.H. App. Vol. II p. 20; *see K.B.*, 24 N.E.3d at 1003 (upholding CHINS adjudication where the parties' children witnessed domestic violence and were able to comprehend it); *see id.* at 1003-04 (holding that a single incident of domestic violence in a child's presence may support a CHINS finding, and it need not necessarily be repetitive); *see also In re R.P.,* 949 N.E.2d 395, 401 (Ind. Ct. App. 2011) (holding that the CHINS statute does not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS if his or her physical or mental condition is endangered).

[24] DCS established, by a preponderance of the evidence, that K.H. "is seriously impaired or seriously endangered as a result of the inability, refusal, and neglect of Mother to supply the children with appropriate shelter and supervision" and K.H. "requires care, treatment, and rehabilitation that she is not receiving and are unlikely to be provided or accepted without the coercive intervention of the Court." *See* App. Vol. II pp. 21-22. The devastating physical trauma that Mother and M.G. suffered, and Mother's inability to recognize the effects of

domestic violence on her parenting and on her children's well-being, warrant the coercive intervention of the CHINS court. The trial court's determination that K.H. is a CHINS is not clearly erroneous. We affirm.

# Conclusion

The trial court's finding that K.H. is a CHINS is not clearly erroneous.

Affirmed.

Baker, J., and May, J., concur.