## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 22 2020, 8:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
C.M.H. (MOTHER)

Mark F. James
Anderson, Agostino & Keller, P.C.
South Bend, Indiana

ATTORNEY FOR APPELLANT
C.A.S. (FATHER)

Philip R. Skodinski
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of C.S. and M.S. (Minor Children) and

C.M.H. (Mother) and
C.A.S. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 22, 2020

Court of Appeals Case No.
19A-JC-2980

Consolidated Appeal from the St. Joseph Probate Court

The Honorable Graham C. Polando, Magistrate

Trial Court Cause Nos.
71J01-1906-JC-284
71J01-1906-JC-285

**Mathias, Judge.**

[1] C.M.H. ("Mother") and C.A.S. ("Father") (collectively "Parents") appeal the St. Joseph Probate Court's order adjudicating their minor children C.S. and M.S. (collectively "the Children") as Children in Need of Services ("CHINS"). The Parents each present a single issue for our review, which we consolidate and restate as whether the probate court committed clear error in ruling that the Children were CHINS.

[2] We affirm.

## Facts and Procedural History

[3] Mother has five living children, two of which, C.S. and M.S, are the subjects of this appeal. C.S. was born July 18, 2017, and M.S. was born August 10, 2018. Father is the biological father of C.S. and M.S. Mother's other living children are B.W., born September 16, 2005;[1] J.R., born February 5, 2007;[2] and M.H., born June 2, 2014. Mother's child C.H., born September 2, 2016, is deceased.

[4] On June 28, 2019, the Indiana Department of Child Services ("DCS") became involved when it received a report that Mother had been found hiding in her mother's ("Maternal Grandmother") home in South Bend with her three minor children—the Children and J.R. Mother was taken into custody on several

---

[1] B.W. lives with her father.

[2] J.R.'s father is deceased.

existing warrants, including a charge for kidnapping J.R. from his relative placement. At the time, Father was incarcerated at Westville Correctional Facility, and his projected release date was February 2023. Law enforcement requested assistance from DCS regarding the three children.

## Previous Involvement with DCS

[5] When DCS family case manager ("FCM") Jessica Bogard (the assessment FCM) investigated the instant CHINS matter involving the Children, she reviewed a DCS report containing allegations of neglect made in June 2014, when Mother's child, M.H, was born and tested positive for "cocaine and some other substances." Tr. p. 38. A CHINS case was begun for M.H.; Mother's parental rights were eventually terminated, and M.H. was adopted.

[6] In September 2016, Mother gave birth to C.H., who was born prematurely and with cocaine in her system. C.H. passed away when she was about two weeks old due to medical complications.

[7] In 2017, J.R. was adjudicated a CHINS based on Mother's drug use and her inability to provide J.R. with stable housing. At that time, Mother "had reportedly been staying in a vehicle with [J.R.]" *Id.* at 42. She had not provided J.R. with his medications and had not sent J.R. to school.

[8] Mother's parental rights for J.R. were terminated on March 27, 2017. At some point thereafter, Mother removed J.R. from his relative placement and went on the run with him for "about two years" because J.R. told her that while he was in his relative placement, he had been molested and beaten. *Id.* at 62.

Mother moved to Memphis, Tennessee with J.R. A warrant was issued for her arrest, and the kidnapping made national news. While in Tennessee, Mother gave birth to C.S. in July 2017. At some point, Mother moved back to South Bend, first living with Father's mother and then with Maternal Grandmother. When she gave birth to M.S. in August 2018, she provided a false name to the hospital because she was in Indiana, was still on the run, and there was a "possible warrant" for her arrest. *Id.* at 63.

## Current CHINS Adjudication

When Mother was apprehended on June 28, 2019, DCS removed the Children and J.R. from Mother's care. The Children were placed in foster care, and J.R. was placed in emergency shelter care while awaiting an opening for placement in a residential facility. At that time, J.R. was twelve years old, C.S. was one year old, and M.S. was ten months old.

The same day the children were removed from Mother's care, J.R. underwent a forensic interview and disclosed the following regarding his time on the run with Mother:

> • "[H]e ha[d] been on the run for about 2 years."

> • "[He and Mother had] been trying to live a regular life the last 2 years but the police keep messing with them[,]" so, Mother could not get a "regular job[.]"

> • Mother "got money online" through a web cam, and "gets money for talking about real stuff that happens."

- "[H]e was homeschooled but he hasn't been doing it for a while because he wouldn't be working on it, he would be playing games."

- He would visit a "live" website to talk to people about what happened and would "try to get girls[,]" but sometimes the people on the website "would show their private parts and there were a lot of guys who had their private parts out."

- When this happened, he would "just X them and hi[t] the ['Next' button so that a different,] random person" would appear on the website.

- Mother knew he was on the website and told him "if he d[idn't] want to do [his schoolwork] he d[idn't] have to." Mother knew about the "private parts and knew the people [on the website] were being weird."

- A cousin molested him when he was placed in relative care.

Ex. pp. 7–9. While in Mother's care, J.R. had missed "two years or a little more" of school; he was behind in math; and DCS was attempting "to determine what grade he should technically be in right now." Tr. p. 52. However, his reading skills were "fairly decent for his age." *Id.*

[12] On July 1, 2019, DCS filed a petition alleging that the Children were CHINS based on Father's incarceration and Mother's arrest and incarceration for, among other charges, kidnapping J.R. At subsequent initial, detention, and status hearings, the probate court appointed counsel for the Parents and set a fact-finding hearing for August 19. The court rescheduled the fact-finding

hearing for September 9, but at that hearing, the court continued the hearing to investigate relative placement for the Children. At a status hearing held on September 23, the court denied Mother's request to return Children to her care and set the fact-finding for October 10.

[13]     The fact-finding hearing was held on October 10, 2019. At that time, Mother was no longer in jail and was again living with Maternal Grandmother. At the hearing, FCM Bogard testified that the reason the Children were removed from Mother's care was because Mother had been arrested and Father was incarcerated, but FCM Bogard confirmed that at the time of the Children's removal, there were no allegations that the Children had been neglected.

[14]     FCM Bogard further testified that Maternal Grandmother's home was not an appropriate placement for the Children because Maternal Grandmother harbored Mother and J.R., knowing that Mother "had taken [J.R.] during that open CHINS case[,]" and during J.R.'s CHINS proceedings, the individuals residing in the home did not pass background checks. *Id.* at 40. However, FCM Bogard also testified that she had not been inside of the home to determine whether the Children's needs were met while they resided in the home. She told the probate court that DCS had investigated whether the Children could be placed with Father's relatives, but one of the relatives was disqualified "based on her fingerprints," and the other failed to provide necessary paperwork and documentation. *Id.* at 41.

On cross-examination, FCM Bogard testified that she was "not aware" of whether Mother's criminal issues had been resolved. *Id.* at 47. When asked whether it would "make any difference" if Mother had resolved her criminal matters, Bogard testified, "There are still concerns regarding the past drug use[,] as that does not seem to have ever been resolved based on non-compliance and then being gone for two years so I don't . . . feel that's a safe situation." *Id.* FCM Bogard also testified that only one drug test had been administered to Mother since her release from jail but acknowledged that the result of the test was negative.

FCM Brian Wigent, the ongoing DCS permanency worker, had been to Maternal Grandmother's home, which FCM Wigent described as "a little messy" but "definitely meets minimum standard living conditions." *Id.* at 53. Nevertheless, FCM Wigent had concerns about the Children's safety if they were placed in the home because "there was no compliance in the earlier case [involving J.R.]" *Id.* Also, the other individuals who lived in the home helped harbor Mother and J.R. and had not passed background checks in the past. When asked if he thought the Children needed services, FCM Wigent replied in the affirmative and further stated:

> It's difficult for me to believe that everything has been rectified from the former case and solved. I believe that DCS needs a little more scrutiny into this matter before we proceed to place the [C]hildren. If you want specifics, I would think that a substance abuse assessment and a clinical interview and evaluation would be in order. If everything that [Mother] is saying is true, then I would expect those to come back recommending no further

services. And if she would submit to random drug screening during that period, it would just take a few weeks and then we would have much more reliable evidence to feel that the [C]hildren would be taken care of well.

*Id.* at 54.

[17] When Mother testified, she acknowledged that she previously had a problem with drugs, which led to DCS becoming involved with M.H. Regarding M.H., Mother admitted that the child was "born with drugs in her system[,]" and Mother "didn't follow through" and "wasn't compliant with DCS." Tr. p. 60. Mother told the probate court that she "just detached from the whole situation." *Id.* Mother testified that with J.R., she knew her parental rights had been terminated when she removed him from relative placement, but J.R. "was being beaten and molested" and Mother "didn't really know what else to do." *Id.* at 62. Mother further testified that while on the run with J.R., J.R. was homeschooled. As for the Children, Mother testified that the Children's medical needs were met—specifically, C.S. received required vaccinations while in Tennessee, and M.S. received medical wellness check-ups at a doctor's office located in St. Joseph County.

[18] According to Mother, the Children's needs were being met; she did not need DCS to assist her in raising the Children; and, because she was no longer in jail, she did not "feel that [she] needed any services from [DCS]." *Id.* at 67. Mother told the probate court that, in the criminal case involving J.R., she pleaded guilty to a Class B misdemeanor and was sentenced to one year of probation.

Regarding her drug usage, Mother testified that she successfully completed a drug program while living in Tennessee. She also testified that since her release from jail, she had taken three drug tests and tested negative on all three. On cross-examination, Mother acknowledged that she had a criminal matter pending in Marion County for possession of cocaine. She explained that after she pleaded guilty in St. Joseph County, she was transported to Marion County where she posted bond in the pending case and was released.

[19] Father testified via telephone from Westville Correctional Facility. He testified that his release date from prison was set for February 2023, but that he had completed a program that positioned him to be eligible for a sentence modification. Regarding the Children, Father stated that he did not believe the Children had been abused or neglected; they were not in need of services; and they had been properly cared for by Mother. Father further stated that if the Children were not returned to Mother's care, he wanted the Children to be placed with his family.

## Adjudication as CHINS

[20] At the conclusion of the fact-finding hearing, the probate court adjudicated Children as CHINS and announced the following findings on the record:

> I – I understand the parties' positions here, and – and I have to
> say that despite . . . the – whatever you want to call it with
> respect to the paternity affidavit, forgery, fraud, whatever, I do
> find Mother to be pretty credible. She conceded everything that
> she – that she needed to and simply made her – her contentions.

And – and I do agree in part with – with what [Parents' respective counsel] said in that there's not a whole lot to point to to say, "Okay, here's where [the Children] were endanger[ed], here's the harm they suffered, or here's the harm they would have suffered had the Department not gotten involved." And I think that's really the issue here, is that we have to try to strike a balance. There's a proposition that's frequently cited that DCS need not wait until a tragedy occurs to intervene. And then also we need to be careful of interfering too early because the danger, of course, with interfering too early is that you may not be justified in interfering at all. By definition, things have not developed yet. And so I think the parties can reasonably disagree [as] to where we are on that line.

To me, this case is somewhat similar to a very recent case affirming a CHINS finding. It's [*K.A.H. v. Ind. Dep't of Child Servs.*, 119 N.E.3d 1115 (Ind. Ct. App. 2019)]. In that case, the facts strongly suggested that the mother's ex-boyfriend had killed one of her children, and – and she argued that now that he had [been] arrested, things had been remedied. And the Court of Appeals rejected that contention. In fact, came down pretty strongly on the contention and focused on – I'm reading verbatim, "At issue before the Trial Court was not just reckoning with the aftermath of the child's senseless death, but also with mother's inability to protect her children from ongoing domestic violence."

Obviously happily this case does not involve the death of any of [the Children or J.R.]. But here Mother is more culpable. There is no dispute that at the time her rights were terminated with respect to [J.R.] and apparently a long time preceding that, she was unfit to care for any children. She then went on a period where she – she believes [she was justified in kidnapping J.R.]. She had to live off the grid apparently for a while, even to the point of defrauding the State, as I mentioned earlier. And I simply cannot find that while she was doing that she also

managed to remedy long-term, deep-seated issues. I recognize the clean drug test. But one clean drug test with that background is simply insufficient.

So I do believe that the Department has met its burden, at least with respect to the allegation of seriously impaired, seriously endangered, and therefore the petition is granted.

*Id.* at 94–95. On October 10, 2019, the same day as the fact-finding hearing, the probate court entered its order granting the CHINS petition without including any written findings of fact.

## Probate Court's Disposition

On October 31, 2019, the probate court held the dispositional hearing. Mother failed to appear, but counsel represented her. FCM Wigent testified that he had spoken to Mother "about five or ten minutes" before the hearing, and Mother "sounded ill" but told FCM Wigent that "she'll do all the services" recommended by DCS. *Id.* at 101. The probate court noted that Mother's failure to appear at the hearing "cast doubt" on its earlier statement that "Mother did seem to have [made] some improvement." *Id.* at 107. When the hearing took place, Father's sentence had been modified, and he had been transferred to a facility to serve three years of work release. At the conclusion of the hearing, the probate court approved DCS's recommendation for services.

Following the hearing, the probate court issued a dispositional order and a parental participation order. Under the dispositional order, Mother was ordered to participate in visitation with the Children; maintain contact with the FCM;

notify the FCM of contact information changes; notify the FCM of any arrests or criminal charges for any household members; allow the FCM to make announced or unannounced visits; participate in services recommended by DCS; keep all appointments; provide written authorization to release confidential information; maintain suitable, safe and stable housing; maintain a legal source of income; establish paternity for either of the Children for whom legal paternity has not been established; not use drugs; complete a psychological evaluation; submit to random drug screens; and complete a substance abuse assessment. Father was ordered to notify the FCM of contact information changes; notify the FCM of any arrests or criminal charges for any household members; allow the FCM to make announced or unannounced visits; and establish paternity for either of the Children for whom legal paternity has not been established. Mother and Father now appeal the CHINS adjudication.

## Discussion and Decision

### I. Standard of Review

[23] In reviewing a CHINS determination, we do not reweigh the evidence or assess witness credibility for ourselves. *In re S.A.*, 15 N.E.3d 602, 607 (Ind. Ct. App. 2014), *trans. denied*. We consider only the evidence in favor of the trial court's judgment, along with any reasonable inferences arising therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). A decision is clearly erroneous if the record facts do not support the findings or "if [the judgment]

applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

[24] Here, the Parents did not request written findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), and the probate court did not issue findings sua sponte. Special findings are not required in a CHINS fact-finding order. *In re S.D.*, 2 N.E.3d 1283, 1288 (Ind. 2014); *see also Matter of N.C.*, 72 N.E.3d 519, 523 n.2 (Ind. Ct. App. 2017) (unlike dispositional order, fact-finding order is not required to include formal findings). Where the parties do not request written findings and the trial court does not issue them sua sponte, we apply a general judgment standard and may affirm the judgment if it can be sustained on any legal theory supported by the evidence. *S.D.*, 2 N.E.3d at 1287; *Samples v. Wilson*, 12 N.E.3d 946, 950 (Ind. Ct. App. 2014).

[25] A CHINS proceeding is civil in nature, so DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2017). Here, DCS alleged that the Children were CHINS pursuant to Indiana Code section 31-34-1-1 (2005), which provides that a child under the age of eighteen is a CHINS under the following circumstances:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.[3] Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287.

[26] "That final element guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *Id.* (quoting *Lake Cty. Div. of Fam. & Child. Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). When considering this requirement, "courts should consider the family's condition not just when the case was filed, but also when it is heard." *In re D.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 580 (Ind.

---

[3] Effective July 1, 2019, the CHINS statute was amended to include the following under subsection (1): "(A) when the parent, guardian, or custodian is financially able to do so; or (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so[.]" Ind. Code § 31-34-1-1. Although DCS filed its CHINS petition on July 1, 2019, it alleged the Children to be CHINS under the previous version of the statute. In any event, the arguments in this case do not implicate the amendment.

2017) (internal quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.[4]

[27] "A CHINS proceeding focuses on the best interests of the children, not the 'guilt or innocence' of either parent." *Matter of D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). "Because a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage." *In re N.E.*, 919 N.E.2d at 106. Indeed, "the conduct of one parent can be enough for a child to be adjudicated a CHINS." *Id.* Also, Indiana courts have found that when children are alleged to be CHINS under Indiana Code section 31-34-1-1, a parent's character is a material issue in the proceeding. *In Matter of Eq.W.*, 124 N.E.3d 1201, 1210 (Ind. 2019). To that end, "a parent's past, present, and future ability to provide sufficient care for his or her child forms the basis for a CHINS adjudication" and a "parent's character is an integral part of assessing that ability." *Id.* (quoting *Matter of J.L.V., Jr.*, 667 N.E.2d 186, 190 (Ind. Ct. App. 1996)).

---

[4] DCS also alleged that the Children were CHINS pursuant to Indiana Code section 31-34-1-2, which requires that DCS must prove all the same elements as under Indiana Code section 31-34-1-1, except that instead of proving neglect, DCS must show that the child's "physical or mental health is seriously endangered due to injury by the act or omission of the child's parent[.]" The probate court's fact-finding order does not specify under which statute it adjudicated the Children CHINS.

## II. CHINS Adjudication

[28] Mother contends that there was insufficient evidence to support the probate court's determination that the Children are CHINS. Specifically, Mother argues that the evidence does not support the CHINS determination because "the conditions that existed at the time [the Children were removed from Mother's care] did not exist at the time of the fact-finding hearing." Mother's Br. at 6. Mother maintains that, at the time of the fact-finding hearing, she "had completed substance abuse treatment, had clean drug screens, had a suitable place to live, and the [C]hildren were being provided appropriate daily care." *Id.* at 9. Mother also argues that the probate court's reliance on *K.A.H. v. Ind. Dep't of Child Servs.*, 119 N.E.3d 1115 (Ind. Ct. App. 2019), in making its determination, was misplaced. As for Father, his arguments rely on Mother's ability to care for the Children, since he is serving three years of work release and is unable to care for the Children.

[29] The evidence presented at the fact-finding hearing establishes that since 2014, Mother has had significant involvement with DCS. Two of her children were born with cocaine in their systems, and Mother's parental rights to two of her children have been terminated. In 2017, J.R. was adjudicated a CHINS based on Mother's drug use and her inability to provide J.R. with stable housing, and Mother did not provide J.R. with his medications and failed to send him to school. At the fact-finding hearing, Mother testified that she did not comply with J.R.'s CHINS case because she "had a warrant [for her arrest]" and "was scared to come to court." Tr. p. 61.

[30] Mother kidnapped J.R., knowing that her parental rights had been terminated. While on the run, she gave birth to the Children. When M.S. was born, Mother did not provide the hospital with her true name, but instead provided an alias because a warrant had been issued for her arrest. Mother's false name is listed on M.S.'s birth certificate.

[31] At the fact-finding hearing, the FCMs testified that they had concerns about whether Mother's past drug use had been adequately addressed. FCM Wigent told the probate court that he believed DCS "needs a little more scrutiny into this matter before we proceed to place the [C]hildren[,]" and he thought that a "substance abuse assessment and a clinical interview and evaluation [of Mother] would be in order." *Id.* at 54. He stated that "it would just take a few weeks" to gather additional information on Mother's drug use and "then we would have much more reliable evidence to feel that the [C]hildren would be taken care of well." *Id.* At the time the fact-finding hearing took place, Mother had a criminal matter pending in Marion County for possession of cocaine.

[32] The probate court heard the evidence and determined that the Children were CHINS. The court noted that it found Mother to be "pretty credible[,]" and the court acknowledged that "there's not a whole lot to point to" to indicate that the Children were endangered or suffered harm while in Mother's care, or that the Children would have suffered harm had DCS not become involved. *Id.* at 94. However, the court ultimately determined that it needed to "try to strike a balance" between intervening too early and waiting for tragedy to occur. *Id.*

[33]    In making its determination, the probate court relied on *K.A.H.*, 119 N.E.3d 1115. In *K.A.H.*, a mother and her boyfriend had an abusive relationship and mother's two children often witnessed mother's boyfriend "screaming, belittling, and battering" her. *Id.* at 1116. At various times, the boyfriend babysat the children. After one such time, one of the children, M.G., complained to his mother that his head hurt. The following day, the boyfriend babysat M.G. again while the other child was at school. At some point, M.G. was nonresponsive and died later that day. DCS filed a petition alleging that the other child, K.H., was a CHINS. The juvenile court concluded that K.H. was seriously impaired or seriously endangered from the mother's inability to provide K.H. with appropriate shelter or supervision and thus was a CHINS. Mother appealed, and a panel of this court affirmed the CHINS adjudication, concluding that the physical trauma that the mother and M.G. suffered, and the mother's inability to recognize the effects of domestic violence on her parenting and children's well-being warranted the coercive intervention of the CHINS court. *Id.* at 1124.

[34]    Here, the probate court noted in its oral findings that the instant case could be distinguished from *K.A.H.* in that neither of the Children nor J.R. died. Nevertheless, the probate court found that Mother was more culpable than the mother in *K.A.H.* The probate court "simply c[ould not] find that while [Mother was on the run] she also managed to remedy long-term, deep-seated issues." Tr. p. 95. The court acknowledged that Mother had a clean drug test[,]" but found that "one clean drug test with that background [was] simply insufficient." *Id.*

[35]	Mother provided testimony at the fact-finding hearing that conditions had changed since her earlier involvement with DCS, and thus, the Children were not in need of services. For example, she testified that she was no longer incarcerated. She further testified that, while she was on the run with J.R. and the Children, she made sure that J.R. was homeschooled and that the Children had seen doctors for vaccinations and medical wellness checks. She told the probate court that she had completed a drug treatment program in Tennessee and recently had clean drug screens. Also, there were no allegations that the Children had been abused or neglected.

[36]	We note that there is some evidence supporting Mother's argument that the children are not in need of services. However, it is not our role to reweigh the evidence and the credibility of the witnesses. *See In re K.D.*, 962 N.E.2d at 1253; *see also Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (explaining that appellate courts grant latitude and deference to trial courts in family law matters). And, as the probate court noted, it was not required to wait for a tragedy to occur before determining that the Children should be adjudicated CHINS. *See In re R.P.*, 949 N.E.2d 395, 401 (Ind. Ct. App. 2011) (holding that the CHINS statute does not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS when the child is endangered by parental action or inaction).

[37]	The probate court was concerned, and understandably so, that the issues that led to the termination of parental rights to two of Mother's children, her past

drug use, Mother's kidnapping of J.R. and her actions while on the run with J.R., putting her own needs ahead of her children's needs in her attempts to avoid arrest, providing a false name to the hospital when M.S. was born, and having only one clean drug test since her release from jail seriously endangered the Children's well-being. For these reasons, we conclude that DCS proved by a preponderance of the evidence that the Children are CHINS pursuant to Indiana Code section 31-34-1-1, and the probate court's adjudication of the Children as CHINS is not clearly erroneous.

## Conclusion

[38] DCS established by a preponderance of the evidence that the Children are CHINS. We therefore affirm the probate court's order adjudicating the Children as CHINS.

Bradford, C.J., and Najam, J., concur.